UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                            :

**MARINA BORISOVA**,                  :

                   Plaintiff,     :   **MEMORANDUM DECISION**

                            :   **AND ORDER**

         – against –          :   18-CV-7440 (AMD) (SJB)

                            :

**WILLIAM FRIBERG** *et al*,         :

                   Defendants.   :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this case against private investigator William Friberg, Police Officers Elizabeth Drozd-Spidle and Rebecca Coogan and the City of New York, contending that the defendants unlawfully searched her store without a warrant, arrested her for selling counterfeit merchandise and seized personal items that were not for sale. Before the Court are the defendants' motions for summary judgment. (ECF Nos. 84, 88.) For the reasons that follow, the motions are denied.

## BACKGROUND[1]

In 2017, the plaintiff owned Marina's Mall, a retail store in Brooklyn that sold clothes, fragrances, costume jewelry and accessories. (ECF No. 73-2 ¶ 1.) Surveillance tapes show the store's layout, which included glass display counters, shelves on the walls and racks of clothes. (ECF No. 88-11.) The main counter, which was near the entrance, had glass on three sides, with merchandise inside. A person could gain access to the merchandise only through the back of the

---

[1] The facts are drawn from the parties' Rule 56.1 statements, depositions and a surveillance video, and interpreted in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

counter, and would have to walk around the counter and squeeze between the counter and a couch. (*Id.*)  There was a second glass display case pushed up against a desk, on top of which was a computer and a cash register. (*Id.*)  The only way to remove merchandise from that display case was to go behind the desk and push a chair out of the way. (*Id.*)

In 2017, William Friberg, a retired New York City police officer from the peddler task force, was a private investigator for luxury brands; one of his routine business practices was to look out for counterfeit goods. (ECF No. 73-2 ¶¶ 7–14; ECF No. 88-4 at 15, 24).  On October 4, 2017, he was "walk[ing] up and down" Avenue U in Brooklyn, checking to see if stores "were openly displaying for sale trademark counterfeited items." (ECF No. 88-4 at 35–37.)  He walked into Marina's Mall at around 3:30 p.m. (ECF No. 73-2 ¶¶ 17–19.)  He "immediately" noticed what he believed were counterfeit earrings, hair clips and bracelets in the glass display case by the entrance. (*Id.* at 37, 40).  According to Friberg, these items had luxury labels like Chanel and Hermes, but were made of cheap metal, priced at less than $100 and had generic packaging indicating that the goods were made in China. (*Id.* at 37–40.)

Friberg spent no "more than five minutes" in the store, and drove to a police station to "explain[] . . . the situation," but could not remember to whom he spoke or what he said. (*Id.* at 41–46.)  He did not remember if he mentioned that he was a private investigator or that he was a retired police officer. (*Id.* at 42–43.)  Nor did he remember what the police said in response. (*Id.*)  He did not make a written report at that time.  At some point, he "ended up" back at Marina's Mall, and waited for police officers to arrive. (*Id.* at 43, 47.)  He did not remember the officers' names, how many officers arrived, or whether they were men or women. (*Id.* at 48.)

At around 5:30 p.m., Police Officers Drozd-Spidle and Coogan arrived at Marina's Mall. Neither Officer Drozd-Spidle nor Officer Coogan remembered who sent them to the plaintiff's

store or what they were told, other than that they were investigating whether the plaintiff was selling counterfeit goods.  (ECF No. 88-7 at 14, 16–17.)  Five or ten years earlier, Officer Drozd-Spidle took an eight-hour course on identifying counterfeit goods, but did not remember who taught the course, whether she learned "specific techniques for identifying counterfeit goods" or whether the course focused on clothing, perfumes, or accessories.  (*Id.* at 9–12.)  This was the only counterfeit goods case that she and Officer Coogan, who had no training on counterfeit goods, had ever investigated.  (*Id.* at 11; ECF No. 88-8 at 7, 55.)

Once they got to the store, the officers and Friberg went directly to the main glass display.  The surveillance footage, which has no audio, shows that they stood in front of the counter and pointed to various items; the plaintiff stood behind the counter and took out what the officers and Friberg requested.  (ECF No. 88-11.)  The surveillance also shows that the officers spoke with Friberg throughout the search and that Friberg directed the plaintiff to show him particular items.  (*Id.*)  At one point, he told her to hand him a wrapped bottle of Gucci perfume, which he tore open and then sniffed.  (ECF No. 88-3 at 21; *see also* ECF No. 88-8 at 22 (Officer Coogan confirming that "Friberg direct[ed] Ms. Borisova to take . . . items out to show him").)  The officers did not arrest the plaintiff at this point; though the video is pixelated, it appears that they allowed her to put the items back into the display case.  (ECF No. 88-11.)

While the plaintiff put things away, the defendants made several calls, but could not remember whom they called or what they discussed.  (ECF No. 88-4 at 81, 90–91; ECF No. 88-7 at 28, 40; ECF No. 88-8 at 41.)  After the calls, Friberg told the plaintiff to step out from behind the counter, and went back there himself.  (ECF No. 88-11).  He rifled through the shelves, opened opaque drawers under the counter and took out several items.  (*Id.*)  He also picked up a large black duffel bag from the floor behind the counter, opened it and took out dustbags and a

3

zipped pouch.  (*Id.*)  He handed the dustbags to the officers and opened the zipped pouch

himself.  (*Id.*)[2]  The officers testified that they did not see what Friberg did, and did not tell him

to open any drawers or bags.  (ECF No. 88-7 at 24–33, 72; ECF No. 88-8 at 60; *see also* ECF

No. 73-2 ¶¶ 31, 34.)  The surveillance tape, however, shows that they were at most two feet away

from Friberg, and looked directly at him when he pulled out the duffel bag; they also helped him

open the dustbags to examine the purses that were inside.  (ECF No. 88-11.)  The video also

shows that Friberg took closed containers from the shelves behind the counter and put them on

top of the counter, right in front of the officers.  (*Id.*)

The plaintiff told the defendants that the things in the drawers and duffel bag were her

personal items and not for sale.  (*See* ECF No. 88-3 at 22–23; 38–42 (explaining that they were

Hannukah gifts she collected for her family).)  She also offered to show the officers receipts for

her merchandise, but they refused to look at them.  (*Id.* at 21.)[3]  Instead, Officer Coogan went

next door and got some trash bags, which the defendants filled with the items they deemed to be

counterfeit.  (ECF No. 88-7 at 48–49.)  The parties disagree about what the defendants put in the

trash bags.  The defendants claim that they confiscated "items from the display case" (*id.* at 49),

while the plaintiff maintains that the defendants took only her personal belongings from the

drawers and the duffel bag (ECF No. 88-3 at 34).  It is hard to determine from the surveillance

video what the defendants took, but as discussed above, the footage shows that the plaintiff put

most if not all of the display items back in the case.

---

[2]  At his deposition, Friberg denied that he opened any drawers or bags—even though he watched the surveillance tape, which clearly shows that he did just that.  (*See* ECF No. 88-4 at 94–96 (Friberg stating "it looks like that drawer was open" while watching the tape); *id.* at 101–02 ("I would not have taken a second look at [the duffel bag] if it was closed.").)

[3]  Drozd-Spidle and Friberg did not remember what the plaintiff said, but Coogan confirmed that the plaintiff "did say that some were personal items."  (ECF No. 88-8 at 32.)

Friberg also walked behind the computer desk and looked at the merchandise in the other counter.  The officers moved clothing racks around but did not take any other property.  (ECF No. 88-11.)  The entire search lasted about twenty-two minutes, after which the officers arrested the plaintiff.  (*Id.*)  Friberg and one of the officers carried the trash bags to the police car.  (*Id.*)

The plaintiff was charged with second-degree Trademark Counterfeiting in violation of New York Penal Law ("P.L.") § 165.72, and spent about a day in Central Booking in Brooklyn before appearing in front of a judge in Kings County Criminal Court.  (ECF No. 85-16 at 1; ECF No. 99 at 5.)  She accepted an adjournment in contemplation of dismissal.  Within a few days, the police returned everything that the defendants had taken from the plaintiff.  (ECF No. 73-2 ¶ 43.)[4]  The charges were dismissed on April 4, 2018.  (ECF No. 20 ¶ 49.)

In December 2018, the plaintiff filed a complaint against Friberg, Triple I Associates (Friberg's LLC), Officers Drozd-Spidle and Coogan and the City of New York.  She alleged two claims: (1) unlawful search and seizure pursuant to 42 U.S.C. § 1983 against the individual defendants and (2) false arrest pursuant to § 1983 and New York law against all of the defendants.  (ECF No. 20.)  On September 25, 2020, I denied motions to dismiss as to Friberg, the officer defendants and the City, but dismissed Triple I Associates, because the plaintiff did not plead any particularized allegations against it.  (ECF No. 49.)  The remaining defendants now move for summary judgment.

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute

---

[4] The officers acknowledged that at least some of the confiscated items were returned and did not provide any records to dispute the plaintiff's assertion that everything was returned.  (ECF No. 88-7 at 64–65; ECF No. 88-8 at 57.)

about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

(1986) (summary judgment is proper only when "there can be but one reasonable conclusion as

to the verdict"). "[A] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of [the

record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies that burden, the burden shifts

to the non-movant to proffer evidence demonstrating that a dispute exists. *Weg v. Macchiarola*,

995 F.2d 15, 18 (2d Cir. 1993). "[T]he non-moving party may not rely simply on conclusory

allegations or speculation to avoid summary judgment, but instead must offer evidence to show

that [her] version of the events is not wholly fanciful." *Morris v. Lindau*, 196 F.3d 102, 109 (2d

Cir. 1999) (cleaned up).

When evaluating the record to determine whether summary judgment is appropriate,

"[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in [her] favor." *Anderson*, 477 U.S. at 255. Said another way, if "there is any evidence in the

record from any source from which a reasonable inference could be drawn in favor of the

nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43

F.3d 29, 37 (2d Cir. 1994). Even where the evidence is undisputed, courts should not grant

summary judgment if different jurors could reasonably interpret the evidence in opposing ways.

*See Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 506 (S.D.N.Y. 2015). Courts may

also consult video evidence submitted by the parties, but summary judgment is not appropriate if

the video does not conclusively resolve material factual disputes. *Hulett v. City of Syracuse*, 253

F. Supp. 3d 462, 482 (N.D.N.Y. 2017); *see Mack v. Howard*, No. 11-CV-303-A, 2014 WL

2708468, at *3 (W.D.N.Y. June 16, 2014) (declining summary judgment where the "case

boil[ed] down to two credible interpretations of the same video").

## DISCUSSION

### I.  State Action and Personal Involvement of the Defendants

Section 1983 only redresses injuries caused by state actors or those acting under color of

state law.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 835 (1982).  There is also no vicarious liability

under § 1983; a plaintiff must demonstrate that a defendant was personally involved in the

alleged constitutional deprivation.  *Ostensen v. Suffolk County*, 236 F. App'x 651, 652 (2d Cir.

2007) (summary order) (citing *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986)).

Accordingly, the first issue to resolve is whether there is a factual dispute about whether Friberg

acted under the color of state law.

The Supreme Court has developed a "host" of different tests to determine when private

conduct "may be fairly treated as that of the State."  *Brentwood Acad. v. Tenn. Secondary Sch.*

*Ath. Ass'n*, 531 U.S. 288, 295–96 (2001) (cleaned up).  Under one test, a civilian defendant will

be held liable when he is a "willful participant in joint activity with the State or its agents."  *Id.*

(citations omitted).  Mere "summoning of police officers or the provision of information to

police officers, even if that information is false" does not satisfy this test.  *Carrillos v. Inc. Vill.*

*of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) (citing *Ginsberg v. Healey Car & Truck*

*Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).  "Similarly, if a police officer's actions are due

to the officer's own initiative, rather than the directive of a private party, the private party will

not be deemed a state actor."  *Id.* (citing *Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d

Cir. 2007)).  Rather, the private actor must take "a more active role" and jointly engage in action

with the police officers.  *Id.*  The Second Circuit has compared this inquiry to civil conspiracy.

*See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("joint activity" exists where a "private entity act[s] in concert with the state actor to commit an unconstitutional act" (cleaned up)); *see also Ostensen*, 236 F. App'x at 653 (citing *Rendell-Baker*, 457 U.S. at 838 n. 6). Under another test, a private defendant acts under the color of state law when he performs a "public function" typically reserved for the state. *Brentwood Acad.*, 531 U.S. at 296.

Because these tests implicate "fact-specific" inquiries, *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995), courts usually give plaintiffs leeway on summary judgment. For example, in *Adickes v. S. H. Kress & Co.*, a defendant argued that there was no evidence "of any communication between any [of the defendant's] employee and any member of the Hattiesburg police." 398 U.S. 144, 154–56 (1970). The Court nevertheless found that summary judgment was inappropriate, because "there was a policeman in the [defendant's] store" when the defendant's employees refused to serve the plaintiff and the same "policeman . . . subsequently arrested" the plaintiff for vagrancy. *Id.* at 156–57. In the Court's view, it was the defendant's "burden . . . to foreclose the possibility" of joint action, a burden the defendant did not meet because the "sequence of events created a substantial enough possibility of a conspiracy to allow [the case] to proceed to trial." *Id.*

Similarly, in *Mizrahi v. City of New York*, the court found that private EMTs were acting jointly with police officers because they all "spoke to plaintiff," "directed her to perform certain acts" and escorted her "out of her building and into the ambulance together." No. 15-CV-6084, 2018 WL 3848917, at *8 (E.D.N.Y. Aug. 13, 2018); *see also Brown v. Fire Dep't of City of New York*, No. 19-CV-2400, 2020 WL 6940992, at *7 (E.D.N.Y. Nov. 25, 2020) (a court properly "inferred joint action between a restaurant owner [and the police] due to the 20 minute conversation and the timing of the arrest" (citation omitted)); *Young v. Suffolk Cnty.*, 705 F.

8

Supp. 2d 183, 198 (E.D.N.Y. 2010) (same, when the police appeared to have been "influenced in their choice of procedure" by a private party (citation omitted)).

Friberg's actions easily satisfy this threshold.  He claims that he merely "[p]rovid[ed] information to the police" (ECF No. 112 at 1), but the record, including the surveillance footage, shows that he did much more.  After looking around the plaintiff's store, he went to a police station and reported what he had seen.  But this was not the end of his involvement.  He went back to the plaintiff's store, and waited for the defendant officers.  Once inside, he directed the plaintiff to remove items from the glass display case, and spoke to the officers about those items.  Then, he went behind the counters, opened closed drawers and removed things, which he handed to the officers.  He also opened a duffel bag, and gave it and its contents to the officers.  The officers put the property into trash bags, and Friberg helped them take the bags to the police car. Indeed, viewing the evidence in the light most favorable to the plaintiff, the only items that the officers confiscated were those that Friberg collected from the drawers and the duffel bag.  This "concerted action" amply demonstrates "willful collaboration" with the police.  *Vivar v. City of New York*, No. 18-CV-5987, 2020 WL 1505654, at *9 (S.D.N.Y. Mar. 30, 2020) (quoting *Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 446 (E.D.N.Y. 2012)).

By participating in the search, Friberg also exercised a power "traditionally reserved exclusively to the State."  *Rodriques v. Furtado*, 950 F.2d 805, 814 (1st Cir. 1991).  A jury could reasonably conclude in this case that the plaintiff answered Friberg's questions and allowed him to open private drawers only because he was accompanied by the police.  *See id.* (a private physician who conducted vaginal search of drug suspect pursuant to search warrant was a state actor for purposes of § 1983 because the "scope and motivation for the search were established solely by the state's investigatory goals"); *Turner v. Procopio*, No. 13-CV-693, 2016 WL

7186488, at *5 (W.D.N.Y. Dec. 12, 2016) (defendants acted under color of state law when they "searched [plaintiff] for contraband at the behest of the police" (citation omitted)).

In short, there is no "'simple line' that can be used to delineate what is, or what is not, state action." *Forbes v. City of N.Y.*, No. 05-CV-7331, 2008 WL 3539936, at *4 (S.D.N.Y. Aug. 12, 2008) (quoting *Brentwood*, 531 U.S. at 295). Summary judgment is not appropriate on this issue.

A related question is which actions can be attributed to each defendant. The officers argue that they did not "personal[ly]" go behind the glass counters or open any drawers or bags. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). And Friberg claims that he played no role in the plaintiff's arrest.

It is true that the officers did not personally go behind the counters or open any containers. Nevertheless, based on the evidence, a reasonable jury could conclude that they "participated directly" in the search. *Haughey v. Cnty. of Putnam*, No. 18-CV-2861, 2020 WL 1503513, at *9 (S.D.N.Y. Mar. 29, 2020) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). As the surveillance tape shows, they stood only one or two feet away from Friberg, and looked directly at him as he held open the duffel bag. Not only did they not stop him from looking through the plaintiff's drawers and removing her things, they examined the items that Friberg handed to them. They put those items into trash bags. And, of course, they arrested the plaintiff based on the property that Friberg took. If an officer "'had a hand'" in the search "'before the object of the search was completely accomplished, [she] must be deemed to have participated in it,'" and "it is 'immaterial'" whether the officer "originated the idea for a search or joined it while it was in progress," because she "may become a party to a search

through nothing more than tacit approval." *United States v. Knoll*, 16 F.3d 1313, 1320 (2d Cir. 1994) (quoting *Lustig v. United States*, 338 U.S. 74, 78–79 (1949)).

Moreover, as discussed above, the plaintiff has established at this stage of the litigation that Friberg acted in concert with the police officers during the search. Although the relationship "between 1983's requirement of personal involvement . . . [and] conspiracy theory . . . is not well explored in the case law," *Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 293 (S.D.N.Y. 2019), courts have "extended" the usual rules of criminal conspiracy "to the civil § 1983 context," *Haughey*, 2020 WL 1503513, at *9 (collecting cases). Thus, a defendant in a § 1983 case may be liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). Under the circumstances of this case, Friberg's actions during the search can be fairly attributed to the police officers.

Friberg's claim that he did not "assist" officers in the arrest (ECF No. 8 at 5) is similarly unavailing. First, although the officers testified at their depositions that they decided to arrest the plaintiff without Friberg's input, the surveillance tapes show that the officers talked to him throughout the time that they were in the plaintiff's store. While it is possible that the defendants were discussing events wholly unrelated to the arrest, the "burden" at the summary judgment stage is on the defendants "to foreclose the possibility" of joint action. *Adickes*, 398 U.S. at 157. Based on the record, which includes disputes of material fact, a jury could rationally decide that Friberg "initiated and intended the process that culminated" in the plaintiff's arrest, and that it was "reasonably foreseeable" that the defendant officers would arrest the plaintiff. *Haughey*, 2020 WL 1503513, at *9. "Such intentional involvement, even if nominally 'indirect,' is sufficient to state a claim under § 1983." *Id*; *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("Although [subsequent] charges were added by the [prosecutor], and thus not

directly filed by [the defendant], a jury could find that [the defendant] played a role in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors"); *Conte v. County of Nassau*, No. 06-CV-4746, 2008 WL 905879, at *21 (E.D.N.Y. Mar. 31, 2008) (finding that the plaintiff stated a § 1983 claim against a civilian defendant because an officer "was under the control or influence of" the civilian, even though the civilian was not present for every discrete action taken by the officer), *reconsideration denied*, 2009 WL 393642 (E.D.N.Y. Feb. 13, 2009).

In sum, Friberg acted under the color of state law for purposes of § 1983, and the search of Marina's Mall and the plaintiff's arrest can be fairly attributed to all of the defendants.

## II.    Search and Seizure Claims Under Section 1983

The general rule is that searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).  The defendants argue that one of these exceptions—plain view—applies in this case, because they were lawfully permitted to enter Marina's Mall just like any other citizen.  In the alternative, the defendants argue that they are entitled to qualified immunity.

### A.  Plain-View Exception

The plain-view doctrine permits an officer who is lawfully present "at the place from which the evidence could be plainly viewed" to search and seize the contraband.  *Horton v. California*, 496 U.S. 128, 136 (1990).  However, to fall within the exception, the officer "must also have a lawful right of access to the object itself."  *Id.*  And retail stores that invite the public

to enter do not "consent[ ] to wholesale searches and seizures." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979).

The plaintiff claims that the defendants took property that Friberg removed from drawers and bags behind the counter.  A jury could reasonably decide that he was not "lawfully located" in that area.  *Horton*, 496 U.S. at 137.  Moreover, Friberg opened drawers, rifled through closed containers on the shelves behind the counter and looked in the duffel bag on the floor—conduct that a store owner would not tolerate from customers.  *See United States v. Dunford*, 983 F. Supp. 658, 666 (W.D. Va. 1997) (plain view does not apply where an officer "determin[ed] what items constituted contraband" only "after he had engaged in [a] wholesale search" of a store, because that was not "normal browsing activity").

Aside from whether Friberg was lawfully in the places he searched, an officer can only seize property whose "incriminating character" is "immediately apparent."  *Horton*, 496 U.S. at 136 (cleaned up).  And the Fourth Amendment "provides protection to the owner of every container that conceals its contents from plain view."  *United States v. Ross*, 456 U.S. 798, 822–23 (1982).  That means an officer is permitted do a warrantless search of a closed container only when the container "speaks volumes as to its contents."  *United States v. Rudaj*, 390 F. Supp. 2d 395, 407 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009) (cleaned up).  None of the drawers, the plain black containers on the shelves behind the counter or the duffel bag fits that description.

The defendants argue that the duffel bag was open, and that the contraband inside was visible.  *See United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir. 1981) (no Fourth Amendment violation when the container was "unsealed," allowing the agent to see "currency sticking out of it").  The plaintiff disputes that claim, and the surveillance tape undermines it.  Thus, this is

clearly a material factual dispute, and summary judgment is inappropriate.  In any event, the

defendants do not appear to dispute that the dustbags and pouches inside the duffel bag were

closed.  Accordingly, even on the defendants' account of events, they would not have been able

to see any supposedly counterfeit purses or jewelry without opening the dust bags and pouches.[5]

Nor would a search of the duffel bag be appropriate simply because the bag was near

property that the defendants thought was counterfeit.  In *Rudaj*, for example, the court rejected

the government's argument that a seizure of a closed bag was justified under the plain-view

exception because the bag was "found next to" other contraband and "resembled other white

plastic bags" that contained contraband.  390 F. Supp. 2d at 406.

Finally, the defendants offer no case law supporting their search of the closed drawers or

plain black containers on the shelves behind the counter.  The plain-view doctrine thus does not

justify this warrantless search.

### B. Qualified Immunity

Qualified immunity protects government actors from liability for civil damages if their

"conduct did not violate plaintiff's clearly established rights, or if it would have been objectively

reasonable for the official to believe that his conduct did not violate plaintiff's rights."  *Mandell*

*v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).  Consequently, "[s]ummary judgment on

qualified immunity grounds is not appropriate when there are facts in dispute that are material to

a determination of reasonableness."  *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999).

As an initial matter, "qualified immunity does not protect a private defendant" like

Friberg "against § 1983 liability where that private defendant is alleged to have conspired with

---

[5]  For example, the defendants claim that they believed the purses were counterfeit because of "poor
stitching," but they do not say that anything about the dustbags themselves suggested that the dustbags
or their contents were counterfeit.  (*See* ECF No. 85-4 at 21.)

government officials to deprive another of federal rights." *Toussie v. Powell*, 323 F.3d 178, 180 (2d Cir. 2003); *see also Richardson v. McKnight*, 521 U.S. 399, 412 (1997) ("§ 1983 immunity does not automatically follow § 1983 liability"); *Mizrahi*, 2018 WL 3848917, at *16 (collecting out-of-circuit cases holding the same).[6]

Nor does qualified immunity shield the officers.  "It was clearly established law at the time that the officers acted that the police may not seize evidence pursuant to the plain view exception unless three requirements are met: (1) the police have a lawful right of access to the evidence, (2) the evidence is in plain view, and (3) the criminality of the evidence is immediately apparent." *Conroy v. Caron*, 275 F. Supp. 3d 328, 344 (D. Conn. 2017) (citing *Horton*, 496 U.S. at 136); *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013)).  As detailed above, there are material disputes of fact as to what the defendants did.  Accordingly, qualified immunity is not available at this stage of the litigation.

## III.    False Arrest Claims Under Section 1983 and New York Common Law

The elements of a § 1983 claim for false arrest are "substantially the same" as those of a "claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999).  To succeed on either claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

---

[6] This is so because "qualified immunity . . . acts to safeguard government, and thereby protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. 158, 167–68 (1992).  The Supreme Court has articulated a "narrow caveat" to this rule, when the private acts "are isolated, taken at the specific direction of the government, or done without profit or other marketplace incentive." *Bender v. Gen. Servs. Admin.*, 539 F. Supp. 2d 702, 714 (S.D.N.Y. 2008) (discussing *Richardson*, 521 U.S. 399).  Friberg does not argue that any of these exceptions apply; to the contrary, he claims he was acting in his capacity as a private investigator for his luxury-brands clients.  (*E.g.*, ECF No. 88 at 5.)  In any event, the existence of this exception is a factual question that cannot be resolved at the summary judgment stage.

privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v.*

*State*, 37 N.Y.2d 451, 456, *cert. denied*, 423 U.S. 929 (1975)).  Probable cause is thus "an

absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).

The defendants argue that they had probable cause to arrest the plaintiff based on Friberg's tip

and their own observations or, in the alternative, that they had at least arguable probable cause

and are thus entitled to qualified immunity.

### A.  Probable Cause

The plaintiff was arrested for trademark counterfeiting in the second degree, which

occurs "when, with the intent to deceive or defraud some other person or with the intent to evade

a lawful restriction on the sale, resale, offering for sale, or distribution of goods, he or she

manufactures, distributes, sells, or offers for sale goods which bear a counterfeit trademark . . .

and the retail value of all such goods bearing counterfeit trademarks exceeds one thousand

dollars."  P.L. § 165.72.  Accordingly, to have probable cause to arrest the plaintiff, the

defendants must have had "knowledge or reasonably trustworthy information" that would

"warrant a person of reasonable caution" to think that the plaintiff (1) possessed counterfeit

goods (2) with the intention to distribute or sell them and (3) their value was more than $1,000.

*See Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("to ascertain the

existence of probable cause, we look at the facts as the officers knew them in light of the specific

elements of each crime," though "an officer need not have concrete proof of each element of a

crime" (cleaned up)).  Moreover, because probable cause must be established "at the time the

arrest was made," *Haussman v. Fergus*, 894 F. Supp. 142, 147 (S.D.N.Y. 1995), the defendants

must demonstrate that nothing during their search of Marina's Mall or their interaction with the

plaintiff "made apparent" "the groundless nature of the charge."  *Kinzer v. Jackson*, 316 F.3d

139, 144 (2d Cir. 2003) (citation omitted).  Because the defendants are moving for summary

judgment, they have the burden of establishing that "there is no dispute as to the pertinent events

and the knowledge of the officers." *Weyant*, 101 F.3d at 852 (citations omitted).

The defendants cannot meet this standard.  They argue that they had probable cause to

arrest as soon as Friberg reported what he saw, because he was reliable and they had no duty to

investigate "every theoretically plausible claim of innocence before making [the] arrest." *Curley*

*v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted).  As an initial matter,

neither the officers nor Friberg remembered precisely what Friberg told them.  In any event, the

officers did not arrest the plaintiff or get an arrest warrant immediately after Friberg told them

whatever he told them; instead, they went to Marina's Mall to investigate for themselves.[7]  Nor

did they arrest the plaintiff after they saw what was in the display case; rather, they permitted her

to put the things back.  A reasonable jury could conclude that even if the officers had probable

cause based on whatever Friberg told them—which concerned only the items in the display

counter—it "dissipate[d]" after that initial search.  *Kinzer*, 316 F.3d at 144 (citation omitted); *see*

*also Brown v. Sears Roebuck & Co.*, 290 A.D.2d 388, 389 (1st Dep't 2002) (recognizing that

intervening facts may likewise "dissipate" probable cause for arrest under New York law).

The items that Friberg took from behind the counter did not create new probable cause

for arrest.  Because those items were inside the drawers and the duffel bag, there is a factual

dispute about whether the plaintiff "offer[ed them] for sale."  P.L. § 165.72.  Moreover, the

parties dispute whether it was reasonable for the defendants to conclude that those items

appeared counterfeit at all, because the police returned them only a few days after the arrest.

---

[7]  Nor did the officers bring evidence bags when they went to the store; one of them retrieved trash bags
from a neighboring store.

*Compare Jennings v. Decker*, 359 F. Supp. 3d 196, 211 (N.D.N.Y. 2019) (declining to find that probable cause existed as a matter of law where the parties disputed whether police actually saw any drug paraphernalia, because the plaintiff persuasively argued that he was not charged with possessing paraphernalia, no field tests were conducted, and no physical evidence was ever examined at the lab). In short, there is a clear factual dispute about whether the defendants had probable cause to believe the plaintiff sold counterfeit goods.[8]

Separately, the plaintiff offered to show the defendants receipts for the allegedly counterfeit merchandise, which the defendants rejected. The "existence of exculpatory evidence . . . negate[s] probable cause." *Waldron v. Milana*, No. 10-CV-65, 2012 WL 3929898, at *7 (N.D.N.Y. Sept. 10, 2012), *aff'd*, 541 F. App'x 5 (2d Cir. 2013); *see also Martinetti v. Town of New Hartford Police Dep't*, 307 A.D.2d 735, 736 (4th Dep't 2003) (recognizing a similar principle under New York law). It is "a corollary of the rule that the police may rely on the totality of facts available to them in establishing probable cause that officers may not disregard facts tending to dissipate probable cause when directly confronted with such facts before an arrest is made." *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017) (cleaned up).

The defendants argue that they had no duty to investigate exculpatory defenses before making an arrest. They rely on *Chahine v. City of New York*, No. 19-CV-276, 2020 WL 2555228 (S.D.N.Y. May 20, 2020), a case in which Friberg was also involved. The court

---

[8] Summary judgment on the state false-arrest claim is also improper under New York law because the "fruit of an illegal search cannot give rise, in a juristic sense, to probable cause to arrest." *Ostrover v. City of New York*, 192 A.D.2d 115, 118 (1st Dep't 1993); *see also Fakoya v. City of New York*, 115 A.D.3d 790, 791 (2d Dep't 2014) ("Evidence which is illegally obtained in violation of a plaintiff's rights may not be used to establish probable cause."); *but see Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001) (calling that rule into question without expressly overruling it). In the federal context, however, "police officers may use evidence obtained in that illegal search to establish probable cause for an arrest." *Hatcher v. City of New York*, No. 15-CV-7500, 2018 WL 1583036, at *4 (S.D.N.Y. Mar. 27, 2018) (citing *Townes v. City of New York*, 176 F.3d 138, 144–49 (2d Cir. 1999)).

dismissed Chahine's false-arrest claim, because Friberg "informed the NYPD that Chahine was selling counterfeit merchandise, and filed a deposition in support of his allegations confirming that merchandise taken from Chahine Sportswear was indeed counterfeit." *Id*. at *2. That information, the court held, was sufficient to establish probable cause. *Id*.

*Chahine* is distinguishable. Unlike the plaintiff in this case, Chahine did not offer to give the police exculpatory evidence. This case is more like *Jocks*, in which an officer arrested the plaintiff for assault even though he knew that the plaintiff was acting in self-defense. 316 F.3d at 135–36. While the Second Circuit reaffirmed the general rule that police officers are not required to investigate all possible defenses and may determine probable cause "based on what the officer[s] knew at the time of the arrest," it also observed that "an officer [may not] deliberately disregard facts known to him which establish" a complete defense. *Id*. The plaintiff does not say that she actually showed the officers her receipts, only that she offered to do so. But it would not have required an onerous "investigat[ion]" merely to look at the receipts, and a jury could consider a refusal to do so as "disregard." *Id*. [9]

## B. Qualified Immunity

"There is no doubt that the right to be free from arrest without probable cause was clearly established" under both federal and state law when the plaintiff was arrested. *Jenkins v. City of New York*, 478 F.3d 76, 87 (2007); *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 845 (2d

---

[9] The City argues that it is entitled to summary judgment solely because the plaintiff has not established the individual defendants' liability. (*See* ECF No. 84 at 1 n.1 ("When plaintiff fails to demonstrate 'any liability on the part of any of the City's agents or employees, [her] *respondeat superior* claim also fails.'" (quoting *Morales v. City of New York*, 59 F. Supp. 3d 573, 583 (S.D.N.Y. 2014))).) As explained above, summary judgment is not appropriate.

Dep't 2011).[10]  Thus, the Court must determine whether it was "objectively reasonable" for the officers to conclude that they had probable cause for arrest, or "arguable probable cause." *Jenkins*, 478 F.3d at 87 (cleaned up); *see also Holland*, 90 A.D.3d at 845.  The defendants claim that they had "at least" arguable probable cause because "Friberg, a trained representative of multiple luxury brands, informed the officers that Plaintiff possessed counterfeit goods."  (ECF No. 113 at 5.)  In addition, the defendants say that "[e]ven if the officers were mistaken in relying on Friberg's affirmations, a mistake of fact would not undermine probable cause."  (*Id.* (internal quotation marks and citation omitted).)

Arguable probable cause, however, must "not be misunderstood to mean 'almost' probable cause."  *Gonzalez*, 728 F.3d at 157 (citation omitted).  "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Jenkins*, 478 F.3d at 87.  The officers' argument—that even if Friberg's tip did not amount to actual probable cause, it "at least" established arguable probable cause—thus misses the mark.

Rather, the officers must establish that an arrest was "objectively reasonable" based on "the information possessed . . . at the time of the arrest."  *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (citation omitted).  It was "well-settled" in this Circuit and in New York years before the defendants arrested the plaintiff that officers could not "deliberately disregard" exculpatory evidence.  *Prevost v. City of New York*, No. 13-CV-3760, 2014 WL 6907560, at *3 (S.D.N.Y. Dec. 9, 2014) (cleaned up) (denying qualified immunity for § 1983 claim); *see also*

---

[10] "New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis."  *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006).

*Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (reasoning that in New York, "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause").  It was also well established, for purposes of § 1983, that probable cause could dissipate with a "discovery of some intervening fact."  *Kinzer*, 316 F.3d at 144 (citation omitted); *see also Brown v. City of New York*, 92 A.D.2d 15, 20, *aff'd*, 60 N.Y.2d 893 (1983) (same under New York law).  As discussed above, material fact issues remain on both these fronts.  A reasonable jury could find that no reasonable officer would have concluded that the plaintiff's items were counterfeit after she offered receipts or that she intended to sell items stowed away in a duffel bag.[11]

\*   \*   \*

Searches, seizures and arrests "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment" outside carefully limited exceptions focused mostly on exigent circumstances.  *Katz*, 389 U.S. at 357.  Similarly, qualified immunity protects officers acting upon "immediate" threats, *Mullenix v. Luna*, 577 U.S. 7, 14 (2015), who are forced to make "split-second judgments," *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999).  There was no such exigency here.  Qualified immunity is not warranted at this stage, though the defendants may raise it again at trial.

---

[11] Friberg does not cite any New York case law that extends immunity to private parties acting under the color of law.  But even if it does, Friberg is not entitled to immunity at the summary judgment stage for the same reasons that the officers are not entitled to immunity.

**CONCLUSION**

For these reasons, the defendants' motions for summary judgment are denied.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       August 8, 2023

22